May it please the court, my name is Gene Iredale and I represent the appellate in this case, Doima Vanessa Michel. This is a simple case. On the 2nd of June of 2014, Doima Michel was stopped at the port of entry. In her car were four bottles. This I'm showing you is excerpt of record 1488. Those bottles said on them that they were Quajo, C-U-A-J-O. The English word for that is rennet. It's a substance, a liquid substance that is used to make cheese containing the protolytic enzyme from the fourth stomach of a calf. The agents suspected that this was not in fact Quajo but was methamphetamine in solution because that is a method that is used to smuggle methamphetamine through the border at San Ysidro. So they did a presumptive test and the test kit turned the color blue and she was placed under arrest. We do not She was charged with illegal importation of 4.55 kilograms of methamphetamine, well beyond the mandatory 10-year term that invokes the presumption of detention under the Bail Reform Act. In fact, she was given a bail, $25,000, but she couldn't make it. Counselor, I mean if we could start with the false imprisonment claim that you've brought. You just said you don't contest that there was initially probable cause when Agent Bowman detained your client and then the magistrate judge orders her held. After that point, regardless of which sort of law enforcement privilege we do or don't apply, how is Agent Bowman committing the element of false imprisonment that requires that he be detaining your client? After that point, even if he wants to let her go, he can't just go to the detention center and let her out, right? Well, he was the case agent and On the 22nd of September, he was asked, would you please contact DEA, the lab, and ask for a rush? And on the 27th, he was asked, would you find out what the status of the chemical analysis is? And he did nothing in response to that. Well, that may bear on your negligence claim, but on the false imprisonment, you have to show a detention by him, right? And my question is, how is he detaining her or responsible for detaining her once the magistrate judge has ordered that she be held? Recklessness as well as intention is sufficient for finding that somebody is falsely detained. His refusal to do those things that he was obligated to do in order to The Supreme Court, in the case of Manuel v. City of Joliet, said that not only is there required to be a showing of probable cause at the beginning of pretrial detention, but that if at some point there is a dissipation of probable cause, there is a violation of the Fourth Amendment in the But I think that Judge Miller's point is that for your false imprisonment claim, that only lies against the jailer, essentially, the holder, correct? Why is that not right, that false imprisonment as a tort only lies against he or she who is doing the imprisoning? Because of the nature of causation. In other words, causation is the issue that the jailer, the jailer is merely doing a ministerial function of keeping somebody in custody. The issue is, was there a causation of that by either the initial illegal conduct of the agent in arresting without probable cause, or as a result of, as in Manuel v. Joliet, perjury, or in this case, reckless disregard of the obligation to do what the case agent is supposed to do, there was causation of the continuance of the false imprisonment. And what, I mean, what is it specifically that you think Agent Bowman had an obligation to do? Is it put in a rush request for the... No, not even that. In answering your question, Judge Miller, may I just advert to the facts and the chronology briefly. On the 2nd of June, she's arrested. When she's arrested, she tells Bowman, this is not methamphetamine, this is Quaho. And Bowman says, yes, and you are a liar. And she says, well, they have to test this, don't they? He says, yes, they do. And you are still a liar. Thereafter, the matter was turned over to the DEA for testing. The other defendant in this case, on the negligence action only, Alexandra Ambrise was the DEA lab technician. She tested all of the Quaho. And by the 10th of September, by the 10th of September, using GCMS, gas chromatography mass spectrometry, which is the state of the art gold standard for chemical analysis, she found that this was not a controlled substance to a level of scientific certainty, 95% certainty. Instead of, and this is where we have the concurrent, and if I could, Judge Miller, may I also address the negligence with this, because they go to both issues. Both the false imprisonment and the negligence, but here's the thing. Ambrise, who has been working for the DEA as an analyst 15 years, is analyzing a quantity of methamphetamine of kilograms and kilograms that could result in a score of more years. And she realizes on the 10th of September, none of this is a controlled substance. Instead of doing a report, or calling the agent, or letting somebody do something, she does nothing for two months. Nothing. She doesn't call the case agent, who she's already met on one occasion, the 9th of June. She doesn't notify her superior. She doesn't notify the assistant U.S. attorney. She does nothing. Now, as to her, we say she's negligent. And the district court clearly erred, as a matter of law, in saying in order for her to be liable for negligence, she had to have positive knowledge that this woman was still in jail. And since she said, I don't know if she was in jail or not, she's not negligent. Well, the question isn't, before you even get to the question of whether she's negligent, you have to show that she's not engaged in the performance of a discretionary function, right? And so, I mean, the government says, you know, she has discretion as to, you know, how to prioritize the various tasks that she has, that she's doing at the lab. What's your answer to that? My answer to that is they are right in part. What we said was, after viewing the evidence, is that issue of when she decides to test is within the discretion of the DEA and within, to a certain extent, her own discretion, because that decision of when to do the test involves the weighing of resources, finite personnel, et cetera. So she could have decided to have tested it a month earlier, three months later, and that was legitimately within the discretionary function. But once she finds out that is not a control substance, once she knows that and she knows it for certain, she has no discretion to delay two months for a couple of reasons. One is, there was never any evidence adduced that the issue of doing the report involved discretion or that they could put that off. And there were two reasons for that. One is, doing the report involves simply this. They press a button on the computer, which has incorporated all the data, and generate this one-page report. So the thing that kept Doima Michelle in custody for almost three months after they knew she was not guilty of anything, was Ambrise's failure to do that action. And is there any policy or regulation that says what she's supposed to do once she's completed the test? Or you're just making the argument that her own judgment about that doesn't involve the exercise of a policy discretion? It is the latter. It is the latter, Judge Miller. But the second reason why that DFE doesn't apply is because the discretionary function exception to the Federal Tort Claims Act cannot violate the Constitution. And in this case, when a representative of the government knows to an absolute certainty that a human being, it is reasonably foreseeable that somebody is... But counsel, you're suing the United States, right? Suing the United States. The Constitution doesn't provide for any waiver of sovereign immunity. That's solely up to the Congress, right? Congress can waive the United States's sovereign immunity in whatever way it doesn't violate equal protection or something like that. So how can it be a constitutional violation if Congress has chosen not to waive its sovereign immunity in this circumstance? Congress... Well, because, first of all, there are many, many cases, and we cited to them, saying the DFE cannot be invoked if it violates a constitutional requirement on the government. And that does not, at least the legal analysis in those cases, does not go into the issue that you raise regarding whether that implicates the original waiver of sovereign immunity. The constitutional violation is... The constitutional violation. Well, I'm going to step out on the limb and say that when an authorized representative of the government has absolute knowledge that somebody is charged with a crime, and they know for a certainty that they're innocent, that it violates due process of law for them to say nothing and do nothing and allow the person to continue to have their liberty deprived on the basis of nothing whatsoever. That's my submission to the court on that. Counsel, you said that the preparation of the report, once the test is done, is very simple and just pushing a button. And I'm going to ask the government this too, but in my looking at the record, I couldn't find very much that said exactly what is to support your view. I had her on a deposition. I said, how do you generate the report? And she said, oh, it's all the data's in the computer and you just push the button and it prints out. But I think she also said something about she has to seal the evidence. And there were a couple other things that she mentioned. Yes, but that was all done. In other words, that's part of the testing procedure. I'm talking about when that is done. And she said that was done with the GCMS, which is enough to give her absolute certainty, on the 10th of September. And it was three more months before Domingo Michel was released. Now, she did do one additional test on the 29th. So I suppose the government could say, well, that additional period is covered under the DFE because she wanted to make 100% sure that there was no methamphetamine. So on the 29th of September, she did do the DFE, which involves an additional test. And again, she knew for certain on the 29th, again, for the second time, that Domingo Michel did not possess controlled substances. None of them. None of them. They were all what Domingo said. They were Quahog. They were to make cheese, not methamphetamine. Counsel, was the issue ever litigated below as to whether the we asserted that she did that. I'm trying to recall Judge Bennett, the district court judges findings, and he never ruled, as I recall, on that issue. In other words, of course, negligence involves duty, breach of which causes harm. We say the duty arises and your duty is the basic duty of everybody who's in the criminal justice system. The famous words of Berger versus United States, the twofold aim of which is that guilt shall not escape nor innocence suffer. And we say, yes, when you as an analyst know that somebody is innocent, you owe them a duty. And that is implied by the nature of your job, by what you're paid to do. And yes, by the constitutional requirements that are imposed upon every government actor. In addition, we argued, and there was no specific finding that her knowledge as the Asian is imputed to the principle, which is the United States. Now, could I just press this for 30 seconds? All right. Go ahead. And that is this. What is so ugly about this situation is this. On the one hand, you have Alexandra Ambrise, who as of the 10th of September knows this is not a controlled substance and doesn't tell anybody for two and a half months. And on the other hand, you have the agent and the case agent is instructed. By the way, the assistant U.S. attorneys covered themselves in glory. They did what they were supposed to. They were saying to this agent, check with the DEA. On the 22nd, Assistant U.S. Attorney Julia Klein said, put in a rush request to get this analyzed. On the 27th, Assistant U.S. Attorney Matt Sutton said to the agent, please check with the DEA and see what's going on with the analysis. And had either one of them, had either one of made an email, a text, a phone call, a letter, anything, this woman would have had three months of her life instead because they decided they wouldn't do anything. For whatever reason, Bowman, without explanation, made no attempt to contact Ambrise. And Ambrise, also without explanation, did nothing to even print out a report. It didn't come out and get to Bowman until the 4th of December. And all, all that was needed, one phone call, 20 seconds, 30 seconds. We say, Judge Bennett, that at minimum, the law imposes that duty on these two government officials. All right. Thank you, counsel. Mr. Chiu. Good morning, Your Honors. Steve Chiu on behalf of the United States. May it please the Court. At the outset, I will acknowledge that this is an unfortunate situation. This is certainly not what we wish to happen. We do not look for people to be in custody longer than is necessary. However, we need to look at the reasons for how this occurred and why we got here. What we have is, one of the large, one of the main reasons is there was no court order, there was no impending trial date. And if there had been either of those, that would have then allowed the DEA lab to process this as a rush request. And one reason why- I don't understand is why she says she, that all she had to do was press a button to complete it and get the report. Just, she says in her deposition, just click it. How is that a discretion? I mean, how does that fall within this discretionary function thing, not to click it? I mean, when you know what the results are? So first of all, that's actually, um, putting that in context, that's just the preliminary part of the report. At that point, testing is done. However, before testing is finally completed and can be transmitted, the results can then be transmitted to the case agent. The results have to be looked at and reviewed by a second- That takes a week, according to her, according to Ambrose. Typically, we want to have two chemists review each case because we want to ensure accuracy. But counsel, we get to a point where, however it is, the chemist knows that there is no controlled substance. And there's still a delay there that the government defends under the discretionary function exception. And the Supreme Court in Berkovitz is talking about, with regard to the second part of the test, even if there's judgment involved, is this of the kind that the exception was designed to shield? How is the discretionary function exception designed to shield a chemist delay in transmitting the results of a negative drug test, where even if she didn't know for sure this woman was in jail, she certainly had seen hundreds of cases where people who are charged with meth are in jail? So how does part two of the discretionary function test here protect what she did? Because we have to look at the reasoning, Your Honor, for the alleged delay. What we have is, as Your Honor has correctly cited, and the Supreme Court has said in Galbera as well, we don't necessarily look at the listed reason or the professor reason. We have to look at the content to see if it is of the nature, by its nature, susceptible to policy analysis. Now, Alexandra Ambrose, the chemist, said that she had to shift focus away. She's constantly working at any given time on 22 to 25 exhibits. She tries to process around 300 exhibits a year. She's often handling multiple at the same time. She had to shift focus away from this, a non-rushed exhibit, to focus on other rushed exhibits. But my problem with this counsel is, at least certainty, that this woman had, that these samples tested negative. And that based on that, that the putative defendant was at some point going to get either released or charges dropped if she wasn't in jail. How does the discretionary function exception protect whatever judgment there was involved from the time she knew there was nothing to the time that that ultimately got to the case agent? Well, first, she didn't, it was at September 29th that she knew with 95% probability. But even at that point, it's still not done until a supervisor reviews it. So, as a preliminary matter, the report is not done. But there was a, I mean, I think that's part of the objection from the plaintiff, is that there was nearly a two-month delay in Ambrose submitting the report to her supervisor. So, I mean, I'm asking the same question in a different way, but what were the policy considerations that would have been relevant to deciding, you know, should I send the result to the supervisor now, or should I wait six weeks? So, the thought process at that point was not so much, okay, let me finish off this one before I move on to another one. There were other things going on that the chemist had to focus on. It doesn't sound like there was any thought process. That's the problem. And there does not even necessarily have to be a specific thought process. Discretionary function has, it involves some sort of judgment. And it sounds like this didn't involve any thought process at all. She just maybe was, I mean, to excuse her behavior. Maybe she was rushed and distracted by the pressure of work, but that's not a policy judgment. Well, so long as the conduct is susceptible to policy judgment, that is a standard articulated by the Supreme Court in Galbert. And should it make any difference whether what the preliminary or even the final, at this point, results of the test are? Is it the government's position that in making this analysis, it doesn't matter that the test results were not necessarily? And the reason is because the chemists typically do not know if a person is in custody. And that is by intention, because we want to preserve the science. That's not relevant. They're testing, what they do know is the person's charged, whether or not they're in custody. They're undergoing some limitation on their liberty. They do know that, otherwise they wouldn't be testing this stuff, right? Certainly, Your Honor. Okay. So the other thing, the other part of this that I find really troublesome is that Ambrose also testified that she found one to three negative results per year with all this testing she was doing, which is astonishing, really, when you think about it, that she only encounters negative results one to three times in a year and doesn't think or didn't think that that was something that was significant to report. I mean, if you're only seeing negative one to three times a year, that's highly unusual. I mean, I can see if it's all positive. Oh yeah, one more positive case. We're in this whole rush analysis. Okay. It's got to get to the court. It's doesn't seem to make any sense with a negative result. Well, Your Honor, there's no statute or rule or regulation that requires her to immediately report the results of any test, positive or negative. And without that, you know, that's why we get into the discretionary analysis question. As Judge Bennett asked also, was the question litigated as to whether or not the chemist may have a tort duty owed to the civil plaintiff criminal defendant. The issue wasn't precisely fully litigated, but there are cases that address this that are similar that typically find that law enforcement does not owe. But that's a different question, right? So even if you lost on the discretionary function, you would still be free, presumably, to argue to the district court that she didn't owe a duty to this defendant. And as a result, there can't be liability under the FTCA against the United States. Even if we ruled against her on the discretionary function, I wouldn't foreclose that argument. That's correct. You know, the question of whether or not there is a duty, it would be separate. They are intertwined to some extent. You know, the cases say, and the circuit has held that the question of negligence is irrelevant on the question of discretionary function because if were it otherwise, then DFE would have little effect. So, you know, the questions are intertwined. But I wanted to also back to a point I was making earlier. The case is about delay, and plaintiff has raised that time and time again. But we have to look at the reasons for the delay. And when we look at the underlying criminal proceedings, the plaintiff or criminal defendant's own counsel had requested on his own three times for continuances and joining requests. Counsel, I mean, I think we're all, well, I won't speak for anyone else. I'm concerned about the delay following the completion of the test. And your plaintiff, your friend on the other side describes it as all she has to do is push a button. And I just would appreciate it if you could shed light on the sort of basic factual question of what happens once the test is done. What does she have to do? And is there anything beyond her deposition testimony on that? Not specifically in the record, Your Honor. It's a little bit more than that. It's not quite as simple as you push one click and it's all done. You know, she does have to review it. She does have to close some things out. She clicks a couple of different places to finalize just the preliminary report. The preliminary report then gets sent to the supervisor for a quality assurance review. That is an important step because the supervisor can kick it back and say, hey, I think you missed something, I think you need to do something else. And that can then trigger additional testing. Right. But I mean, if we're focused on what happens between when she does the test and when she sends it to the supervisor, which here was close to two months, the more ministerial that is, the harder it is to understand how her decision to wait so long could, not that she, I understand she doesn't have to be weighing policy considerations, but how that decision could involve the weighing of policy considerations. And at that time, you know, she moved away from that task because she had to testify in court on another case. She had to work on other rush exhibits and this was a non-rush exhibit. And she also had to undergo training. So she's balancing multiple cases at the same time. You know, the question is not so much, could she have done this faster? Because then we, the problem is we get into the slippery slope and we're starting to tell the DEA level, here's how you must do things. You must follow everything through to completion before you go onto your next case. And that's not unfortunately, in the real world, how they are able to do it, because at any time, if they're hit with additional rush cases, they may have to drop the non-rush cases. Although we don't have to say all that, we don't have to give detailed instructions to the DEA if we were to rule against you. But we might say that if in circumstances like this where you have a negative result, this is not the kind of circumstance that the discretionary function exception was designed to protect. So it wouldn't be impacting cases where they hadn't done a test, only ones where they had come back with negative. How would that hurt the policies that underlie the discretionary function exception if it were so limited? Well, I mean, there would be a couple of concerns, Your Honor. It is always easy, of course, in hindsight to look back and say, well, sure, she could have done more, acted more quickly. We do run into the slippery slope as I've articulated, and that's always a concern. Once we start to tell the DEA lab how to do things, where do we draw that line? And that's a big problem because it won't be just a simple, okay, in this case, do this. It can also be read and it will be argued, well, then you should also, when you suspect that it is negative, or when you've done one test that says it's negative, that's a big difficulty, a big challenge for the chemists. We have other policy considerations that are being weighed at the time. I've talked a little bit about that, but is it susceptible to the policy considerations that the DEA lab has a backlog of 5,400 exhibits, is down eight vacancies, and they're trying to prioritize between rush and non-rush. And again, this was non-rush. How often does this occur? How often does it occur that we have a... Situation. Has this ever occurred before? Not that we're aware of, Your Honor. As Your Honor pointed out, maybe two or three times a year out of 300 exhibits, they may get a negative result, but each case is different. So have you tried to mediate this case and resolve it because, in fact, it happened? Have you tried the Ninth Circuit Mediation Unit? We didn't proceed into the Mediation Unit. We've been in regular touch with opposing counsel on the case. We've had regular dialogues on the case, but we haven't gotten to the point of negotiating to that point, Your Honor. Okay. Suppose we think, and then you're focusing again on the period between the completion of the test and the submission of the report, suppose we think that the record doesn't tell us enough about what that activity is to allow us to make a conclusion one way or another on whether it is susceptible to policy analysis. What would be the appropriate disposition in that case? Well, it's always a possibility to remand the case for further fact-finding. We could have testimony not just from the chemist, but from the lab director, both of whom did testify. Well, but I mean, you moved for summary judgment, right? And suppose the district, I guess, the question is, who wins when it's not clear? Is it your burden to show that this fits within the exception, or the plaintiff's burden to show that it doesn't? On discretionary function, who has the burden of establishing the exception? I mean, as I recall, the government initially has to show facts to demonstrate that it is of, the conduct is of the type that can be susceptible to policy analysis. So I think that's right. So, I mean, doesn't that mean that if we're not sure based on, you know, just a couple lines in her deposition about, you know, I have to seal up the evidence and look it over and send it on to the supervisor. If we can't tell that there are policy choices involved, potentially involved in that decision, then we would have to reverse, right? Potentially. I mean, I would submit that in the record, there is sufficient evidence because she did talk about things that she had going on at that time. And we have testimony from the lab director saying, well, here's why we have the policy. We're trying to get everyone what they need when they need it. You know, we're balancing the Southwest region lab supports many different states and many different submitting agencies. So it's always a balancing act. And at some point, all the content is susceptible to policy analysis because of that. See them out of time, unless your questions, unless your honors have any further questions. Right. Thank you, counsel. Thank you. I'll give you a minute longer. Yeah. I need to say three things if I could. In the record exhibit, at excerpt of record 134 is the one page report that we're talking about. Counsel was saying, oh, it's very complicated. Pushing the button generates the first part of this report. And then the supervisor reviews it and these additional two lines are generated. But she also, I mean, I'm looking at the deposition transcript that you referred me to earlier, said a thousand eight thousand nine. She also said that it typically takes her about a week to do once the test is done to prepare the report. And she said there are rushes, sometimes other things come up. So it does sound reading that like she's this is one task that she has to balance against other responsibilities. I can only cite to you the record and her testimony. She didn't say, oh, it was complicated or anything else. Basically, she said I had training. I had other things. And I got busy and I forgot. Well, that was the gist of her testimony. If it typically takes about a week, that does suggest that it's more than simply pushing a button. Well, if that's the case, then the government, as a matter of proof, had the obligation to reduce the facts in the court below to show the applicability on the discretionary function exception. There was no testimony from the lab director or from her that the issue of making the report involved the use of discretion or was subject to discretion or was something that was involved. Choice or judgment in the act. There was no contention from either Mr. Malone, the lab director or her that it involved choice or judgment. It was just this is what we do. Now, I was sensitive to the legitimate exercise of the discretionary function exception when they say when it is tested, because our initial position was, well, you should have tested it right away. And they said, no, we have a lot of things to do. We have to balance the needs and the resources, et cetera. So we conceded when it is tested is absolutely within the discretionary function. That involves policy judgment. But the issue of doing the report, they adduced, and this is simply on the record, Judge Miller, no, they adduced no evidence whatsoever that there was a policy of discretion or that they gave discretion or that there was any suggestion or rule of thumb or that they could put it off. It was simply she forgot. That's all. And there are cases that say, if you let somebody say my negligence was an exercise of policy discretion, it can allow that exception to eat the statute. And that's what I respectfully submit they were trying to do here. I apropos of settlement, no, there's never been any request. Were you willing to go into mediation? Of course. Of course. Is the government willing to go into mediation? All right. Michelle versus Customs and Border Protection is submitted and the session of the court is adjourned for today. Thank you very much. All rise.
judges: Wardlaw, Bennett, Miller